Case No. 14-1234 NL. Bais Yaakov of Spring Valley v. Federal Communications Commission NL. Good morning. May it please the Court, Matthew Brill for the Class Action Defendant Petitioners. In enacting the TCPA and the Junk Fax Prevention Act, Congress drew a stark distinction between fax advertisements that were unsolicited and faxes sent with express permission. Congress directed the SEC to impose detailed rules on the unsolicited faxes but provided no authority at all with respect to solicited faxes. The SEC's order obliterates that clear distinction and thus runs afoul of the text and structure of Section 227B. Mr. Brill, can you describe how typically fax advertisers obtain or how their advertisers are solicited? How do people, if I'm an owner of a fax machine and I want to solicit advertisements, how do I typically do that? Your Honor, I don't know that there's a typical method because we have in this record very large businesses, very small businesses. We have oral consent that's solicited on the telephone. I might call you up and say, I'd like to send you, this was effectively the Knack v. Wahlberg case. Knack v. Wahlberg was an independent publisher, a small business, and would obtain one-time permission to send a fax and I believe would do so via telephone and call and ask the recipient for that consent or pin it in writing. My client and a generic drug distributor would invariably pin that in writing. Tell me a little bit more how that goes. They write me a letter and they say, if you want my fax ads, call me. They say, send me a letter. I'm guessing that. So Ava had a niche in the market in dealing with mom-and-pop pharmacies that typically didn't want to use computers for email. They might have a single computer to use for Medicaid, Medicare lookups, and would expressly prefer faxes when the prices of generic drugs would change, and they would change almost daily. And so at some point in establishing a relationship with a pharmacy customer, the pharmacy would be asked for express consent to deliver pricing information by fax. So, you know, typically that would be part of establishing the business relationship in the first instance. And we know from the statute that Congress was trying to solve a very narrow problem with this opt-out provision. As a general matter, unsolicited faxes are prohibited. But Congress created in the Junk Fax Prevention Act a narrow carve-out from that prohibition to allow an unsolicited fax to be sent where the sender has an established business relationship with the recipient. And the problem with that was that having a business relationship simply doesn't tell us one way or the other whether the recipient wants to receive a fax. It's at best inferred or presumed consent. And recognizing that problem that arises in the absence of express consent, Congress tried to solve the problem in that narrow instance by requiring an explicit opt-out notice on the first page of the fax. But Congress didn't see a need to require those notices on faxes that were sent with express permission. The whole point of having somebody opt in is that it obviates the need for them to be told how to communicate their preferences. And we know this limitation because the text and structure of this statute are clear. Section 227b-2 contains the directive to the SEC to prescribe regulations. What if the fortunate recipient says, yes, you can send me a fax? Do you keep sending faxes at them? No, Your Honor. I mean, it's up to the recipient to define the scope of his or her consent. And there can be a number of instances where a recipient... The telephone solicitation point that you made triggers that hypothetical in my mind. If the solicitor on the telephone says, may we send you a fax with an advertisement on it, and the person says yes, what is that person authorizing? One fax? Well, I think, you know, there often are factual disputes that arise in these court cases about the scope of the consent. And that's really not an issue here because we're dealing with cases, for example, the Knack v. Walford case, where both parties agreed there was a one-time request for consent and it was granted. And in that instance, it's crystal clear... I agree with you that, I mean, it seems to me there would be a good many factual disputes, particularly if the consent was oral on the telephone, that one way of doing away with any problems is simply to require opt-out on every fax. And, Judge Randolph, I think that goes to the question whether there might have been a sensible policy reason to require that. And that is a judgment that Congress didn't make in this instance. And Congress sought to balance here competing interests. Those legitimate consumer protection interests were undoubtedly part of this statute, but so, too, were the legitimate business interests. And recall that this act, this Jump Fax Prevention Act, actually expanded the rights of senders of faxes after the FCC had curtailed them. The FCC had initially established the established business relationship card act and then took it away. Congress gave it back because it wanted to allow faxes when they were pursuant to either express consent, which is wholly unregulated under the statute, or when you've gone through the specified procedures to provide the opt-out notice. Mr. Burley, you say express consent, which is wholly unregulated, but you've also conceded, I think, correctly that there are often factual disputes about the scope and nature of express consent. Given that, putting aside the Junk Fax Act, before that was enacted, is it your position that the FCC lacked authority to regulate, to help define, what counts as consented to fax and what counts as unsolicited fax? No, Your Honor. We're not arguing that they had no authority to define those parameters, but I think the critical fact is that's not what the FCC did here. The FCC could have said, we're going to define what it means to receive an express invitation or express permission, or to answer Judge Randolph's question, we're going to specify that there must be some specific grant of authority for an indefinite grant of permission, not a one-time grant of permission, and I think they probably could have done that, depending on how they justified it, but that's plainly not what the Commission did. Page 22 of their brief, they concede that this opt-out notice they're applying to faxes that are sent with express consent. They're not arguing that there's some factual uncertainty, and it's easiest to see in the case. Over time, the question is, if I say, sure, send it to me, and as I understand the way the industry works, once you get someone filling out their fax number somewhere, there's an aspect of implication that that's consent, and then faxes start flowing, and at some point, people say, well, I signed up, but not for the rest of my life. I want to get out of this, and the consent stops, and the question is, how can that be communicated? So isn't that part of the problem that, in fact, the problem that they're looking at? I don't think the Commission said in its order or its brief that there's uncertainty at the front end whether there's consent. They're saying instead something slightly different, that sometimes recipients don't know how to revoke their consent, having given it. And, again, the problem is Congress struck a particular balance and said we want these opt-out notices, which take up space and, most importantly, subject senders to massive liability, only for unsolicited faxes. So the Commission could have defined more tightly what it means to grant permission. What it couldn't do is if we consult the legislative history, Congress said we're concerned about unsuspecting or uninformed businesses being subject to unforeseen and costly litigation. And that's precisely what the Commission has done here. The Walbert case, again, is a good example. There, there was no dispute. There was this hypothetical concern about consent, not consent wasn't present. Both parties agreed there was a single request for a fax. It was consented to. When it was sent with an allegedly deficient opt-out notice, the result was a lawsuit taking up to $48 million for the transmission of a single fax. And that is a wildly disproportionate result that is exactly what Congress was concerned about. You argue that Congress not only did not do this and provide the authority, but they could not do it under the First Amendment. We do, Your Honor. Your Honor, we think the statute is clear. And under the Chevron principles that are imported through our APA argument, the 16 references. I understand that. But just on the First Amendment, you agree that Congress, or do you not, has authority to require the opt-out notice on the established business relationship category? We do, Your Honor, because those are unsolicited faxes that there's no evidence that they're wanted. And the problem with applying this rule to fax consent with express consent is that it's massively overbroad. Again, subjecting a business to $48 million in damages for complying with a request is just what Congress was worried about, and it doesn't legitimately serve any governmental interest. The single request for a fax is the best example. In that case, where we have a consented- If there were lighter penalties, would the First Amendment issue go away? Is that not a First Amendment- I don't think so, Your Honor. It just emphasizes just how massively disproportionate these burdens are. I mean, what Congress, what the Commission could have done is something far narrower. Importantly, Section 227D, unlike B, applies to all faxes, whether solicited or unsolicited. That's the provision that requires you to put at the top of the fax the sender's identity, the time and date stamp, and the outbound, the fax number from which it's sent. The Commission could have said, using authority that applies to all faxes, that all faxes need to have a number that can be called back for an opt-out. And that wouldn't have given rise to a private right of action, because only a violation of regulations prescribed under 227B give rise to these lawsuits. So it would have been narrower in the sense that it wouldn't have compelled speech on faxes that Congress tried to carve out, and it wouldn't have subjected senders to these massive penalties. I think... But Congress clearly wanted to, I mean, Congress chose the $500 minimum penalty. But it did so only for unsolicited faxes. And they did so because they really wanted to stop the problem. And so when you talk about, you know, the concern, they're trying to draw a line. They're trying to allow advertisements that people want. The pharmacist who says, hey, where's my price list for the day? And they're trying to stop those that people don't want. And as I understand this, Wahlberg, it's a very unusual situation. You're not usually calling and saying, hey, can I send you a one-time fax? That's just not the way most of this business operates, right? I don't know if we can tell for the record how frequent that is. I'm sure there are plenty of times when people are seeking more durable consent, yes. And that that's something that is legitimately within the agency's interest in regulating and that was contemplated by Congress and might be actually backed up at some point. But, Your Honor, I think, again, we're not having a policy discussion about what might have been... Absolutely not. That's not our family work, and that's part of my point. And then Section 227B2 very specifically says that the commission should prescribe rules to implement the requirements of the subsection. The only requirements pertain to unsolicited faxes. That term is mentioned seven times in V1, which prohibits generally the sending of unsolicited faxes, and another nine times in the opt-out provision. And critically, this definition of unsolicited advertisement means one that's sent without express consent. So we have these two categories. And in all of this Court's cases, when the commission tries to stray from a category over which it's been given authority to one where it doesn't, the Court has said you cannot rely on statutory silence. This Court's decision in Aid Association for Lutherans is a good example. The Postal Service had authority to regulate the availability of bulk mailing discounts when it was insurance coverage that wasn't duplicative of coverage already in the marketplace. And the Postal Service said, well, we're going to limit those discounts also if we're offering an insurance type that's already available in the marketplace. And this Court said that doesn't work at all. Insurance coverage is not an insurance type. So here we're talking about a problem. And, you know, the established business relationship, I think it's really fair to say that Congress looked at that and said, well, there is a kind of implied consent there. There's a relationship, and we're going to allow that to be constructively kind of deemed to be consented to, but we want to have a check on the back end. And so we're going to have the opt-out just to make sure. And the way I understand the industry, as a recipient in some cases, is that there's in many of the cases the way that consent is established, there's a similar, you know, uncertainty about the durability of consent, let's say, the scope of consent, whether the person who gave the consent really wants the fax. And so it makes sense to have one opt-out regime for those businesses who are sending permitted faxes. And under your view, you would contact two different ones. You'd have the one that goes to the whether consent once given can be, is intended to continue, and then a different notice for established business relationship fax. It's burdensome. I think, Your Honor, that Congress answered this question for us in the following sense. Congress often gives the FCC very broad authority in other parts of the act, but the Cablevision case that the FCC relies on is a grant of authority to police unfair acts in the cable programming arena. The commission notoriously has merger authority over deals based on the public interest convenience and necessity. This court said in Cablevision where there's a sweeping grant of authority, it should be given sweeping application.  This is a very narrow grant of authority. Congress could have said to the FCC, we want you to administer a regime to ensure that people can opt-out of receiving faxes. And as they did in Section 227D, they could have applied that to all faxes. But that's not what Congress did in stark contrast to 227D. It didn't say administer rules and you fill gaps and decide to which faxes they apply, in which case they might have drawn the conclusion that this is opt-out notice. Can I ask you a question about the compromise line drawing? And this may be the sketchiest kind of bank shot legislative history, but I just want to ask about this, which is Commissioner O'Reilly's statement says, if Congress was concerned that consumers that had consented to receive fax ads might change their minds, it could have provided for that in the statute, but it chose not to do so. In fact, I distinctly remember working on this issue while I was being debated in Congress. I raised this precise issue with the staff of a sponsor of the Senate bill, and the answer was that a future Congress would need to address it if it chose to do so. Are you aware of anything more than that that we have to confirm that understanding of what was going on? You know, we certainly appreciate Commissioner O'Reilly's corroboration of our view. I mean, we're not relying on his own recollection of the legislative history. I think it's clear from the Senate report that Congress was limited in its concern about opt-out notice to a category of faxes that were sent without consent pursuant to this established business relationship, and it manifestly limited this opt-out notice provision to that category. In the other category, solicited faxes, those that would express invitation or permission, were simply left out, and it's not that, as Judge Pillard posits, Congress couldn't have done it differently, drawn a different line, but the key here is that Congress did draw a line that the Commission had to respect, and we hope that this goes forward. So just to be clear, it's your view that if the FCC had thought, well, this consent, you know, we're supposed to only regulate unconsented faxes, so we're going to define consented as those that are in the individual case where consent has been obtained for that fax, that they could have that rule, and that would be under 227. You know, that kind of rule, of course, would be subject to the APA, and depending on how they justified it and how they explained it in light of the concerns, perhaps. I mean, we're not saying they can't, you know, define the category, because 227.85 does say that the definition is without express invitation or permission. If the Commission was concerned that those words are unclear, we don't think they are, again, it perhaps could have said what it means to be in the category of unsolicited faxes, but they're conceding that they're regulating in that category of unsolicited faxes of those sent with express permission, and that's what we're saying they cannot do. Okay, we'll give you time for rebuttal. Thank you, Your Honor. Good morning, Your Honor. Samantha Dunn for the SEC, arguing now about the rules. So Your Honor, I just have a couple of questions about the fax involved and the issue that the SEC was dealing with, and I think those really cut to the heart of this case. It's fine to say a first fax is solicited, but then there's an open question about whether a second fax is solicited. The SEC might have drawn a different policy and said each one has to be individually consented to, but that's burdensome, obviously, for both faxers and recipients. So instead it decided after parties in the rulemaking in 2006 were asking it to clarify this issue of when is a fax solicited, and it said we will presume that this consent continues for a fax that the customer is consented to. But once we're in that regime where we're going to presume consent, we have exactly the same problem as under the established business relationship. Once you've assumed consent, you need a way that a consumer who actually would prefer to opt out can express. That's not what Congress said in the statute. That's the problem. Congress put in the opt-out notice requirement for the established business relationship and didn't for this kind of situation where there has been express permission or consent. That's right, Your Honor, but I think it's important to – Decent policy argument, I understand. I mean subject to examining it in the context of a particular case. But as to the statute, it does seem to draw this line related to established business relationship, which was the whole motivating force behind that statute to begin with because the FCC had backtracked on that. I think that's right, Your Honor. I think the thing that really matters here is the agency is trying to get at a problem of unsolicited faxes, and the record showed that the reasonable way to do that was not to prohibit, certainly, solicited faxes, but have an opt-out notice on solicited faxes. It's using the authority that's attached to unsolicited faxes to regulate faxes that are sent with permission. It is, Your Honor. That's correct, but that's because – Well, that just seems a problem, doesn't it? I mean that's – I don't think so. Here's why. I don't think we can – I don't think this Court ever turns a blind eye to the policy implications of a regime when it's asking what would Congress have intended. I think that those questions are intertwined. So would Congress have intended a regime in which a customer can consent to a solicited fax and then has no good way to get out of it? The record showed, by the way – By the way, is it that hard to get out of it? Well, yeah, so let's talk about that. It is. I mean, these people have given consent, so there's been, by definition, the category we're talking about, the recipient has given express permission. Right. And so that person who's given express permission doesn't understand how to contact the person to stop. That's what the record shows. So for example, there's a problem of once – let's say the customer was – I can come up with a hypothetical – was contacted on the telephone, would you consent to me sending you these advertisements? Sure, that's fine. Then it starts to get fax advertisements. The fax advertisements at the top have the sending number, not the number you would call to get out. The customer may not know what number they should call to get out, and the record showed that some of these faxers have numbers which only go out, right, as sort of a bunch of machines that only send faxes. There's some testimony from State Attorneys General in the 2006 proceeding about that. Another party offered evidence in the rulemaking that he tried repeatedly and tried calling up people and said, stop sending these faxes, and the people picking up the phone would say, gee, I'm not the guy that sends the faxes. I don't know how you get out of this. So the agency had a record that this was an itch that needed scratching. This was a real problem. And just to sort of give us a little bit more context, it's not typically someone calling on the phone and saying, can I send you faxes? It's typically you're providing – I mean, it's not that far off the EBR situation. You're providing information about a fax somewhere and filling out a general form. I think that's right. I think it's important to realize that there can often be a lot of overlap between an established business relationship fax and a solicited fax. The solicited fax, there can't be a definitional overlap because an EBR has not been explicitly consented to, but if a party says, check the box, it says, keep sending me faxes, that's the only difference is that they've checked this box. So the fax on the ground, there might be a very similar and overlapping set of characteristics. The problem I have is I think you would have had maybe a stronger argument if you adopted this rule pursuant to your general rulemaking authority. And that gets you into morning versus family publication service and so on and so forth. But the FCC specifically said that it's resting on 227. And it's hard for me to see how you can take 227 and impose a requirement that is on solicited faxes. Here's the link in our IHR. 227B prohibits unsolicited faxes and tasks the FCC with implementing rules, issuing rules to implement that restriction. The Commission was worried about those faxes after the first fax that the customer no longer wants to get. Those are unsolicited faxes. So the agency is still dealing with that problem of unsolicited faxes, which Congress has instructed it to attack the implemented rules. Commissioner Pai said something that caught my eye. When the legislature passes a statutory scheme that precisely tracks a congressional compromise, interpreters must respect the contours of that compact. I assume you agree with that. Yes. And here, the point being, the compromise or the problem was the established business relationship and unsolicited faxes more generally. There may be a problem with these consented-to faxes and trying to withdraw permission, but that's still not an unsolicited situation. And is there any indication, let me put it this way, is there any indication in the legislative record that Congress or any member of Congress was seeking to impose the opt-out notice requirement on all faxes? No, Your Honor. That problem emerges through the expert agency trying to implement this actual regime. So no one ever said that in Congress? No, but it did, of course, task the agency with implementing this ban on unsolicited faxes. So I understand that two of the FCC commissioners thought that they saw a strict line in the sand that Congress had drawn, but I would suggest that given the policy implications, that doesn't make a lot of sense because you're still left with this problem that customers don't want these faxes anymore. I believe Judge Randolph was asking, is that even an unsolicited fax anymore? The agency could have defined unsolicited fax, again, to require agreeing to each one. I mean, the agency could also have said, once you give your agreement, there's no getting out. You can never revoke that, and that is what it means. That would be a separate problem. Well, they could do that, right? And so the question is, if they could do, you have to do it every single time. If they could say, look, you know, either of them, you agree to this. I mean, clearly. I think that's exactly, to your point, that Congress has, in the CCPA, said it was trying to balance individual privacy rights on the one hand and commercial freedoms of trade on the other. So clearly the statute involves kind of balancing. And the agency, you know, expert in this field, based on a record about these problem faxes, is trying to balance those aims. So it asks, again, of course not prohibiting solicited faxes, but imposes a notice at the bottom of solicited faxes because that record should. Otherwise, parties would have trouble getting out of these faxes. You know, one of your arguments leaped out at me when I read your brief, after stating that the V1D nowhere suggests that the commission is not permitted to adopt additional rules to ensure the general prohibition against unsolicited faxes is not circumvented, which is what your argument is. Correct. Yes, Your Honor. But then it's the next line that struck me. It says, nor have defendants explained why Congress would have affirmatively prohibited such a requirement for fax ads sent with permission. That, to me, is an invitation for, it's a power grab by the agency. Because Congress doesn't have to affirmatively prohibit something. Agreed, Your Honor. If you read the statute, it says, this far and no further. Agreed, Your Honor. So, and probably inartfully stated, I think our point is, given a regime in which the agency is tasked with preventing unsolicited faxes, and given the state of the record that this was the best way to get at that, given, again, those policy considerations, then I think in that realm the question under Chevron 1 is, you know, is this something that's out of balance. All right. My only point is Congress doesn't have to say, and you cannot regulate. Absolutely. Certainly don't contest that, Your Honor. Okay. Thank you. Oh, sorry. Other questions? I'll take another moment. Yes. Good morning, Your Honors. A. Tom Bellen for the Base Council of Interveners. Your Honor, our position is that under Chevron this regulation is fully appropriate. The TCPA says nowhere that the FCC, nowhere prohibits the FCC from regulating solicited faxes. It does talk about – This was apprehended, Judge Randolph. I understand. And I like it. It seems to me it misstates the way the courts go about interpreting statutes. Well, actually, Your Honor, I believe – They don't have to prohibit it.  This court ruled that Congress ordinarily expects an agency to regulate circumstances or parties beyond those explicated in the statute. That's something that this court has held. I believe Your Honor may have been the writer of that opinion. And I think that the fact of the matter is, in a Chevron context, the first question in the Chevron step one is what the agency did prohibited by the statute. The answer is, in this case, it's no. They're arguing expressly what we need to argue, which this court has struck down many times in the administrative context. It doesn't have to be expressly prohibited. We look at – the Chevron itself tells us, put in their mind, all the tools of statutory construction to determine whether the statute as a whole prohibits this. They pointed to nothing in the statute which says anything about solicited faxes. Or fails to authorize, another way to say it. Well, that's true, but under Chevron step one, you have to – I think everyone here would agree that the statute says nothing about solicited faxes. It says that the agency – it talks about unsolicited faxes, but says nothing about solicited faxes. That's an argument for the class action defendants. It says nothing about unsolicited faxes, and the only thing it – or solicited faxes, and the only thing it regulates is unsolicited. Your Honor, that was the same argument that was made in the Mourning case before the Supreme Court in 1973. And the defendants there argued the statute has said that it can only regulate a situation where a finance charge is imposed, and the agency there said you could also regulate a situation where something – where the payment was for installment. I do not remember it well. I argued it. Oh, that's right. Okay. So in that – Not with the defendants. So in that case, Your Honor – I was surprised that we won. I think you probably did a better job than you thought, Your Honor. But the bottom line is the Supreme Court over 40 years ago made clear that the fact that the statute specifically talks about regulating one thing. In the Mourning case, it talked about specifically regulating finance charges, but the agency was able to regulate installment payments, and it just wasn't in the statute. It's the exact same thing here. It's totally in the National Association case. But the problem is, as I said to the counsel for the FCC, the FCC is not relying on the broad regulatory provision that gives them authority to promulgate regulations in order to implement the statute. It's relying on a very specific portion of the FCC's authorization, which is 227B. And that's what triggered this dispute because of the liability that's attached to it. Well, 227B allows the agency to issue regulations to enforce that section. And that's the Chevron Step 2 part, Your Honor. This regulation protects against the setting of unsolicited faxes and allows people to get out of getting unsolicited faxes. First of all, the agency recognized in the 2006 ruling that because Congress had required in the JFPA that consent could be received either orally or written, they were concerned that there would be numerous times that there would be phony claims of consent or what they called, quote-unquote, erroneous claims of consent. And representing plaintiffs in these cases, I can tell you that in almost every single case, the defendants say, we got consent. Well, when did you get it? Well, do you have anything in writing? No, we have nothing in writing, but you consented to it. And so there is a lot of examples of fraudulent and erroneous claims of consent. And in those situations, if the solicited fax rule were not there, you'd have situations where the company would say, well, it was solicited. We're sending you this fax because it's solicited. We don't have to tell you how to opt out. But the problem is, Your Honor, the agency found that a lot of those cases. It's a mismatch, though, between the problem and the solution. I respectfully disagree, Your Honor, because the problem is that the parties who did not get consent will say that they did and then would not put away the opt-out. And what would happen is people would be getting un- People will still do that even with the opt-out notice. No, they won't because under the opt-out machine, because it's required both for solicited and unsolicited faxers, an entity that claims, oh, it's solicited, you agree to it, still has to include the opt-out notice. So it covers a situation where- No, but they still might continue sending them, saying they consented when they hadn't consented. The problem is consent is not being respected, which I think is what you're articulating, or a failure to get consent is not being respected. And this is a way to ensure that people who get faxes for whom that claim of consent is a lie or erroneous have a way of opting out. That's exactly what the statute is supposed to protect, protect against unsolicited faxers. And the agency made a reasonable decision on their expertise that because it was going to- because Congress had required an oral, allowed for oral consent or non-written consent, that people would be getting these things in a fraudulent way. These people had to have a way to get out of getting those unsolicited faxers. I mean, you acknowledge that they get one free fax, right? They should be able-they think they have consent. They're willing to stand up in court and prove that they had consent by, let's say, phone. They have a log, and then they send a fax and doesn't have an opt-out notice. But they have a different way of proving consent, liable or not liable. If they sent a fax without an opt-out notice, are you saying they actually had consent, Your Honor? They actually had consent. If they actually had consent and they don't include the opt-out notice on it, then they are liable. The mismatch, I think, is that that is about ensuring the consent for the next fax, the consent or not. It's about saying, okay, I consented to that one. I've seen it. You know, I had my dog and pony show. I don't want it. And then you opt out. And so there's this funny kind of time lag problem with the opt-out being the basis of consent for the fax on which it appeared. Well, I think the mismatch is, Your Honor, that you're requiring the match to be to the fax that was just sent. There's nothing in the statute that requires that. The purpose of the statute is to make sure that people don't get unsolicited faxes, whether it's that very fax or faxes in the future. Was there any evidence to follow up on the point you just made that makes me wonder, do you know whether there was any evidence before the commission indicating that if you had an opt-out notice requirement for every fax advertisement that's sent, that it would encourage unsolicited faxes to be sent because if the recipient does not opt out, that's a good argument that they consented to? No, Your Honor. The consent has to be expressed according to the statute. It's not a consent by silence. In fact, the FCC has... But I'm not talking about this. I'm talking about during a lawsuit. If the person receiving the unsolicited fax did not opt out, contained an opt-out clause, that is at least maybe a jury argument that they actually consented to? No, it isn't, Your Honor. Your Honor, the consent under the FCC rules has to be consent to receive fax advertisements, and it must be expressed under the statute. Oh, yeah. But if I express consent, it's not opting out. The sender would claim that the person actually consented. There's proof of that. Look, they did an opt-out, and they had an opt-out clause. But a negative option is not permissible under the statute. That's what I'm saying. The statutory language requires that the consent be expressed, that the person affirmatively consents. And the FCC has ruled... They argue in a telephone conversation that she consented to a fax. And as proof of that, we sent her a fax, really unsolicited, but we sent her a fax with an opt-out clause, and she did an opt-out. I've never heard that argument made, Your Honor. I mean, I just haven't. The problem also is the assumption underlying that, I believe, is that it's inappropriate for the agency to not require everybody who gets an unsolicited fax or an unsolicited fax that's claimed to be solicited to bring a cause of action. What the agency was saying is, look, we want to give people the ability who are getting unsolicited faxes that are, quote-unquote, erroneously called solicited, to get out of it. And we don't want them to have to bring a lawsuit. It wasn't very expensive, as these cases show. They go on for years, even in individual cases. Your position is that all permissible fax advertisements, whether through an established business relationship or through express permission, must contain an opt-out notice. And the reason for that is twofold. If that's true, Congress could have said that pretty simply. But Congress left to the agency to issue regulations that would support persons not getting unsolicited faxes. And it was reasonable for the agency and its expertise to say, look, we know people are fraudulent in sending these things. We know people make errors in sending these things. We wanted to allow people to opt out of getting unsolicited faxes. That's number one. Number two, to also support the unsolicited fax requirements that Congress has, it was reasonable for the agency to say, well, just because you consented once doesn't mean you want them forever. Even though the agency allowed us to give them a lot of latitude, said you get one consent, and that's fine. It goes on forever. And so the agency said, but, you know, you've got to give people a chance to opt out. If people don't want them anymore, Your Honor, and this is very important, if people don't want them anymore, then the faxes that are coming up are unsolicited. If there's no way to get out, then they keep on getting these unsolicited faxes. And that is exactly what the TCPA was. The fact that Congress in the statute only required the opt-out notice for unsolicited faxes does not prevent the agency in an effort to support the statute's policy of preventing opt-out notices from requiring opt-out notices where maybe erroneously called solicited faxes or actually are solicited faxes to prevent future unsolicited ones. Let me ask you the same question I asked other counsel. How typically is consent to faxes obtained in your experience? Your Honor, in my experience, consent is almost never gotten. I mean, I hate to say this, but as a plaintiff's attorney, I have not seen it gotten. A lot of people claim, well, they gave us their number. They gave us their fax number. That is not sufficient under the FCC rule. So when that issue is litigated, they are showing what? They are showing a phone log. They are showing a list of fax numbers that accompanied submission of a contract or that accompanied access to a webpage or what? It's terrible. Sometimes it's just oral testimony. I have a case that stayed in the District of New Hampshire right now. It's one of the cases here, where at the deposition, you know, they said, well, we don't have any records. You know, but sometimes we told them, sometimes we said, would you like us to send a fax about our products? We said, okay. That's the typical deposition testimony. It is rare that you have anyone come forward with anything in writing. I don't think I've seen it. There may be one or two cases. And it's not typically happening through Internet forms? No, not that I've seen, Your Honor. I don't see it through Internet forms. The experience of people is generally they're getting these faxes, they never ask for them, and when you try to press the defendants for proof, you get all sorts of vague comments. They sent us a fax number. I have a case now in the Southern District of New York where they say, well, they sent us their letterhead with a fax number on it, so therefore that's consent. Okay. I think we have your argument on this point, and we'll hear a couple minutes from rebuttal, and then hear from you later. Thank you. I'd like to start with the Morning case, since the Commission and interveners are relying on that, because I think it illustrates just how different that statute was, and why it's an issue in the Truth in Lending Act, and why it really makes our point here. The Truth in Lending Act was a deliberate desire by Congress to give the Federal Reserve Board sweeping authority. The statute said that the regulations issued by the Board may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary and proper to effectuate the purposes of the Act, to prevent circumvention or evasion thereof. And in response to that sweeping language, the Supreme Court said, Congress made a decision to lay the structure of the Act broadly and to entrust its construction to an agency, and it goes on to talk about it was a clear desire to prevent evasion. This statute, unlike some other parts of the Communications Act, couldn't be more different. There was a judgment to include a very narrow opt-out provision that speaks only of unsolicited advertisements, and Congress did speak to its intent by defining unsolicited advertisement to mean a fact set without express permission. What about Texas Rural Legal Aid, where there's a prohibition on political activity, and the question was whether that extended to other controversial local issues? I think that's a lot like warning, Your Honor. What the statute said in that case was that legal services courts should make grants and contracts as are necessary to carry out the purposes and provisions of the Act, and it further gave it express discretion to provide the most economical and effective delivery of legal assistance. So there, too, we have a very sweeping grant of authority. There's little doubt that the gaps that were being litigated were within that sweeping grant of authority. Here, the general authority is to bar, shall be unlawful, any person within the United States to use any fax machine to send an unsolicited advertisement. And so the implementation under 227 is what is unsolicited, and how can a consumer express, hey, that's unsolicited, stop. I mean, if you didn't have the rest of the statute, wouldn't that be really within Chevron for them to read that and say, well, we're going to help? No, Your Honor. A couple points. One is that the SEC concedes that it's achieving its policy goals by regulating the transmission of an unsolicited fax. It's easiest to see in the single request or in your earlier hypo that first fax as to which there was clear consent. I'm sorry, unsolicited, but you meant solicited. I'm sorry, solicited, yes, those sent with permission. So they're regulating those sent with permission to achieve a policy goal. Congress simply didn't give it that authority. This is a lot like the Commission's argument in the U.S. Telecom case, where the dispute was over unbundling authority with telephone network elements and whether the SEC could delegate that authority to state public utility commissions. And the Commission argued there, as here, that it was achieving the broad interest in unbundling and nothing in the statute prohibited that kind of subdelegation. And what the court said was that that silence just left the lack of authority untouched. And it said, I think to Judge Randolph's earlier point, you don't need thou shalt not language in the statute. And the absence, the quote was, in other words, the failure of Congress to use thou shalt not language doesn't create a statutory ambiguity of the sort that triggers Chevron deference. And I think that's exactly this case. There's no question that there's nothing affirmative in this act that gives the Commission authority over facts that sent with express permission. To the contrary, the 16 references to unsolicited advertisements all incorporate the definition of that term of art, which is a fact sent without express permission. And the SEC concedes it's regulating the very thing Congress said it shouldn't regulate, facts that sent with express permission. And finally, to this question of disputes over whether consent was, in fact, given, that doesn't justify this sort of prophylactic measure. And I respectfully disagree with plaintiff's attorney's representation that consent is never obtained. But on my client, it's always obtained. In the trial court cases, we have affidavits from pharmacy customers who express not only their willingness but their desire to receive our pricing information. The key is that triers of fact will resolve those disputes. We have a burden to prove consent is an affirmative defense. Courts don't just take our say-so. And we'll lose these cases if we can't demonstrate evidence of consent. So that's really a red herring. If that's really the concern that we don't know, triers of fact will decide those factual questions and it obviates the need to regulate the very thing that Congress carved out of the statute. Thank you. We'll move on to the waiver decision argument. Mr. Bellin. Thank you, Your Honors. I deserve three minutes of rebuttal time, please. Your Honor, as this Court is well aware, Congress provided a tripartite enforcement scheme under TCPA for violations of regulations promulgated pursuant to 227B. First, the FTC has the authority to enforce those regulations administratively. Second, the states have the authority to enforce them through judicial proceedings. But Congress was not satisfied with leaving the choice of whether to enforce these regulations in the hands of the FTC or the states. Congress specifically created a private right of action, which gave private individuals the power to sue defendants for sending facts in violation of regulations promulgated pursuant to 47 U.S.C. 227B. The statute, Congress gave the courts, specifically gave the courts, and not the FTC, and not anybody else, the authority to determine whether the statute had been violated through the violation of regulation, to determine whether there should be trouble damages as a result of both unknown and own violations, and to determine what sort of injunctive relief to grant under the statute. This is a clear situation which is covered under the Adams-Fruit decision in the Supreme Court and the National Resources Defense Council case in this Court, which basically says that when a statute specifically gives an individual the right of action and puts the authority over determining whether that cause of action has been proven in the hands of the court, that an administrative agency has absolutely no power to create defenses to those causes of action. Now, what they've done here, Your Honors, they've used, they're bootstrapping themselves into jurisdiction. They're basically saying, well, we're going to use our waiver authority, which we created, by the way, under 47 CFR 1.3, and we're going to say that we're going to waive the regulation, and therefore the statutory right of action that the statute actually gives you, you can't sue anymore. And the agency can't do that. This Court held that in the National Resources Defense Council case. In that case, EPA had actually created a standard by rule, which in the standard said that there are certain circumstances where the standard doesn't apply. So they actually did it by rule, not through a waiver, with notice and comment, et cetera. And this Court said, it doesn't matter that you're doing it by rule. It doesn't matter that the statute, the Clean Air Act, provides for the fact that you can sue for violation of the regulation created by the EPA. This Court said EPA has no authority to do that. Now, EPA did not have authority to do that by rule, Your Honor. They don't have the power to vitiate a statutory clause of action through the waiver of a rule. Now, there's another line of cases, though, that I don't fault you because nobody's raised them. There's a line of administrative law cases under the heading of primary jurisdiction. Where a suit between private parties takes place, and the Court, there are Supreme Court cases on this, holds that suit in abeyance and orders the parties to refer it to the administrative agency to give a definitive interpretation of its statute. That's an issue in the case. And then the case comes back. Now, this is different because I assume that none of these trial courts, that 29 cases or whatever they are, order the parties to refer it to the FCC to get its opinion. But the analogy is there. The agency then makes a decision on the basis of its statute that affects the private clause of action. Are you familiar with that line of cases? Yeah, I'm familiar with that line of cases, Your Honor. But I think there's a big difference here. Congress in the statute has said who is to decide whether there's been a violation of the regulation. The Congress in the statute says it's the courts and not the FCC. There's not a question here of whether the regulation is unclear, although they say there is, but that's in the first part of the argument. Assuming that the regulation is clear, it's a simple issue of fact, which is something that district courts typically decide. Juries decide that. District courts decide that. There's no unclarity that requires the expertise of the agency. Usually those sorts of things. The FCC's order was unclear. Well, Your Honor, here's the thing. Our position is that the FCC's order, well, first of all, the regulation was absolutely clear. And the regulation. Federal register notice and the report and order have that. You're familiar with what I'm talking about. Footnote 154 out of over 200 footnotes. Well, the footnotes can be where all the important stuff happens. Of course they can, Your Honor. I understand that. Justice Douglas once quoted Chief Justice Hughes in an opinion where he was dissenting, and the quotation was, footnotes don't count. Right? But he said it in a footnote. Irony. That's the definition of irony. But I would say, Your Honor, I can move on to the issue of whether the waiver fits under the weight radio and so forth. But I first want to focus on the issue of the statute. The statute says when there's a cause of action. The statute does not give the authority to the agency to waive the statutory cause of action. The way it works is, Your Honor, the statute says the cause of action for violation of the regulation, and SEC argues that it in turn gets to promulgate regulations and enforce those regulations, not just enforce, but interpret them. And then in this case, they determine that they had been sending conflicting signals in the prior regulation. Well, Your Honor, they didn't interpret the regulation. Actually, they said the regulation was completely clear. What they did was give an excuse not to follow the regulation. That's the major difference. If they had said that if they interpreted solicitable terms, solicited facts, or unsolicited facts in a particular way, then we would be bound by that. But that's not what they did. What they did is they read their prior issuances on this issue and said, we legitimately believe that we confused the regulated party by saying two different things simultaneously, and as a regulated entity, it would be unfair, due process kind of concern, to hold someone liable or to expose them to massive liability based on inconsistent statements that we gave. The statute simply does not give them the authority to create a defense for the cause of action. It just doesn't. It says under Adams-Fruit, Adams-Fruit says, if the statute gives the court the power to make the determination whether there's a violation, then the agency simply does not have the power. It's an agency power grab here, Your Honor. They're trying to undermine the statutory right that was vested, that was created by Congress. The moment that- Do you agree that the cause of action here, though, is a cause of action for violations of the regulation? True, and that was true in the Natural Resources Defense Council case as well, where this court held that just because it was a violation of the standard or regulation that the EPA created didn't mean that the EPA had the power to create a defense to that standard. It specifically said, this court in that case, said that because the statute said that the courts have to make the determination of the violation and not the agency- But I don't think that case didn't involve, you know, past agency issuances in confusing ways that the agency said would be unfair to use just common parlance, unfair to expose someone to massive liability, or any liability, based on something that we did that was confusing. Respectfully, Your Honor, I think that this question conflates the two separate issues. One, the first issue is whether the agency has any authority whatsoever to create a defense to the statutory cause of action. Your question more turns to, if they do have that authority, did they exercise it properly? And the first point I want to make, and I'll move on from it, the first point is that the agency doesn't have that authority. In fact, in the National Resources Defense Council case, the agency argued, well, we do have the authority because we're the ones who are promulgating the regulations, and therefore we can put in these defenses. And this court said, no, you don't. When the statute is clear as to who has the authority to determine whether a violation has occurred and says it's the courts, it's the courts and not the agency. That's a decision made by Congress. It's not a decision made by the agency. Now, I'll move on to the second issue, even assuming, by the way, there's absolutely no case that anyone has ever cited and that we're aware of where an administrative agency was permitted to vitiate a cause of action provided for under a statute when Congress has not explicitly provided that they're allowed to do so. And, in fact, the General Savings Statute, which is 1 U.S.C. 109. Is there any case saying the opposite? Well, yeah, I think so, Your Honor. I think the National Resources Defense Council case says that. I think that some of the other cases that we cited say the opposite. I didn't argue that, but I wrote it. I understand that. I don't mean to pull your stuff back to you, Your Honor, but I was very happy to see that you had written that decision. But the point is that the General Savings Statute is another thing that's important to consider here. The General Savings Statute, 1 U.S.C. 109, says that the only way that there's a vested statutory cause of action, the only way that the cause of action can be done away with, is by Congress explicitly passing legislation that says that they're doing away with the cause of action. That was the get rid of the common law rule. Now, what about the Supreme Court's line of cases? What about it? Jewel Tee? The Portland Portal Act? I'm sorry. I'm not familiar with that, Your Honor. I don't believe anyone has cited these cases. Yeah, they're in the 1940s. And massive liability was incurred by mines because they didn't pay the miners at the time they entered the mine, as opposed to when they got to the mine face and the coal face. And Congress passed statutes abrogating it in the Portland Portal Act of the Supreme Court of Health. Right. That's fine. Congress can do that. Congress didn't do that here. Congress hasn't passed any statute abrogating any vested statutory cause of action. Congress can do it. Why can't the agency when it's a regulation? Well, Your Honor, I mean, the reason the agency can't do it, as Your Honor has pointed out in the other argument, is they were never given any authority to do that. And they can't do it by regulation when the statute says that gives the courts the power to decide it. They simply do not have that power. If Congress has not passed any statute, and the only power the agency has is the power that Congress delegated to it, and Congress has not vitiated the cause of action, then, a fortiori, the agency can't vitiate the cause of action. Why do you want to move on? Okay. I'd like to hear about the good cause argument. Yes. Okay. So the commission basically sort of, I'm using this phrase, a loosey-goosey determination that there was some sort of ethereal vapor of confusion created by this one footnote at a 220. Not a single applicant for a waiver ever said they read the footnote, ever said they were confused by the footnote. All they said was there are these footnotes. And, in fact, in the comments, if you look at the footnote. What? If you read the footnote, you would say, oh, the opt-out notice requirement does not apply. No, Your Honor. If I read the footnote and I were an attorney for Staples or Anvil, big companies, and they came to me and said, gee, we've seen this footnote. It says it doesn't apply. We've never seen the text that says it does. We've seen the regulation that says it does. If I read the footnote. We note that the opt-out notice requirement only applies to communications that constitute unsolicited advertisements. Your Honor, none of the defendants, they have to come forward with concrete evidence under radio. Concrete evidence to guarantee to a waiver. They came forward with none. They came forward with no evidence, hypothetical about maybe they'd be confused. It's not a basis for a waiver. That's what the SEC is saying. They're allowed to say hypothetically someone could have been confused, therefore going to give a waiver. Not one of them brought forth any evidence. And we pointed it out in our response to comments. And you know what Vick said on reply? We don't have to come forward with evidence that we were confused. It's not that this court is eager in the air that we're confused. That's ludicrous. I mean, it just doesn't pass the high burden that a person has to show to get a waiver from effective regulation. This court has said that if the text of an order is inconsistent with a footnote to go by the text, this court has also said that if the report itself is inconsistent with the plain language of the regulation, you go by the regulation. If they want to make some due process claim, some due process claim which they haven't, that somehow it's both of them. And certainly the backdrop to this is that it's a violation of fair notice, due process to set out two different prohibitions that are inconsistent with one another or an express permission combined with a carve-out from a prohibition. It's unfair then to impose liability on someone. And that constitutes good cause. Well, they don't say due process. No. Number two, if that's the position the court can take, that it's abrogating all the other cases that say when there's an inconsistent footnote with the text, you go by the text. Or when there's inconsistent text with the plain language of the regulation, you go by the regulation. Again, Your Honor, not a single one of them ever asserted they were confused by it. That is what is required by weight radio. The agency can't just make a random determination to say, well, gee, we're going to grant waivers if we think there might have been confusion. The people have to come forward and say they were confused. They have to come forward and give evidence that they were confused. They provided nothing. And, therefore, they don't satisfy weight radio under that. And, number two, they also don't satisfy, based on the particular facts of the waiver, based on the particular facts of the waiver in the public interest. Because the public interest in this statute is to make sure, in this regulation and the statute, is to make sure the people are getting faxes they don't want to get anymore don't get. And the public interest, as reflected by the TCPA, is that there's a private right of action to bring for violation of that regulation. All the FCC said was, well, the public interest is that there was confusion, which is not a public interest. And they said that, you know, and they said there may be significant liability, but that's a private interest of the parties. And they even admitted that liability in and of itself is not enough. And, finally... I was going to cut you off, but go ahead. The final thing I'm wondering... Try to wrap it up if you can. They did not articulate a relevant standard for when they were or were not going to give a waiver. They just said people similarly situated, which, by the way, is everybody, because their determination is not based on individual claims by individuals, but rather a general serial notion of confusion. Sounds sort of like a class action. Well, no, because in a class action you have to actually show proof that there was damage. Here there's no causative connection whatsoever. They don't come forward with it. And, in fact, the Commission's Bureau later on has granted waivers. It's not on the record. They said you don't need to bring proof that you were confused. It's just enough that there's sort of an aura of confusion. And that is not what they're showing to waivers. Okay, we'll give you some time on the rebuttal. Thank you very much. Good morning again, Your Honors. Matthew Jones for the FCC. So I'll start by reiterating something I said earlier, that Congress, in setting out the statute, made a finding that it was balancing individual privacy interests and commercial freedoms of trade. So clearly Congress was worried about the tension between these. The agency was doing something similar in this order. It decided to keep the order prospectively. But it also had a mess of its own making. The agency had set out an order which flatly contradicted itself and the regulation at issue. I really don't understand the position. The order is nowhere contradictory. Well, the order has a footnote which says the regulation itself. Right. I mean to say that the order contradicts the regulation. Right. So it's true that I think the agency assumes, as it must, that regulated parties read its orders. It's true it's a statement of the law that the CFR would control over an order. But that doesn't mean a reasonable party might not be confused. And no requirement of proof of actual confusion? Well, that depends on what you mean by proof of confusion. So here the agency... Something showing that they actually were confused. Sorry. So I guess I mean how specific that has to be. So the agency set a presumption that parties were confused given the flatly confusing and contradictory order that it issued. But it remained open to proof to the contrary. So it's sort of ordering proof in its own... And who would prove that? Who would prove the negative? Well, as your honors are aware, a motivated class action bar wants to prove that these parties were in fact not confused. And in fact, in some cases, for example, discovery has gone forward and they would have evidence about what people knew and when. And maybe a party has made public statements, for example, that would belie any confusion. I guess I would say that FCC was in a somewhat unenviable position of having to clean up its own mess. But again, it was a mess of the agency's own making. And it decided today, or rather in 2014, the best thing to do was to grant the waivers that had been applied for because parties reasonably may have been confused. You want to distinguish the NRDC case? Yes. Because that was one raised. Thank you. So your honors, I think, are probably more familiar with it, especially some of you than even we are. But as I read that case, I would distinguish it on two grounds. One is in NRDC, the agency purported to use its affirmative rulemaking power to create an affirmative defense to be used in the case. It wasn't exercising any of its normal rulemaking or administrative powers. It was creating a brand new affirmative defense that it claimed had to be respected by a district court. And the second point in the way in which it's different, I think, is the agency was also, as I read the case, and again, you would know better, sort of trying to pull a fast one. So it had previously tried to excuse certain kinds of pollution by rulemaking power. This court said the statute prohibits that kind of excuse. So there was a statutory limit on pollution. And the second bite of the apple said, well, okay, there's an affirmative defense if you reasonably polluted but couldn't have prevented it. So the agency was clearly trying to circumvent an express statutory requirement about pollution limits. And I read that as an important subject to what's going on in the order. Here, by contrast, the violation complained of is the agency's own rule, and it's not set out in the statute. Mr. Dunn, in beginning your remarks, you said that the statute and the agency is trying to balance these interests, permitting solicited faxes and stopping unsolicited faxes in Congress created this cause of action and this minimum $500 damage amount. And yet, when the agency was considering the public interest in its assessment of whether a waiver was appropriate, I didn't see anywhere that the agency considered the reliance of plaintiffs and the cost that they had invested in enforcing this legislation under Congress's enactment. I'm wondering why that isn't taken into account in this statute, which is about nuisance faxes. Right. I think if I have the correctly marked-up copy of the order that I can find it quickly. If not, I can find it for you and submit it later. But there is a citation in the order that the commission does specifically take note. Obviously, the Congress intended to – there's a disincentive effect, of course, of preventing unsolicited faxes and also recompensing parties that have received unsolicited faxes. The agency explicitly acknowledges those interests and says, in this case, given I think it's sort of a multiplication equation, you have a problem of the agency's own making and a very large liability, neither of which separately might suffice. But combined, the agency found that that interest outweighs the interest on the other side of the ledger for the public interest. It also pointed out, of course, that because the rule is retained prospectively, that it will continue to allow parties to opt out of future unsolicited faxes. So there's the benefit of that. In a probalactic rule like this, of course, looking backward, there's no probalactic effect in the past. But the concern, I guess, is it was years on the books before the waiver authority was exercised, and so there are parties going forward who would not have invested the time and if the clarification had come earlier, if the clarification had been sought earlier, the ANDA order or the ANDA petition was not even seeking clarification on this point. It was seeking clarification of the authority, as I recall. And so it just seems a little curious for the agency to believe that there was such a mess for it to clean up when it had not seemed to trip anybody up and it had been very much relied on by the individuals, the businesses that are supposed to be protected from this. There's certainly no dispute we would have been in a lot better situation if someone had sought declaratory ruling much earlier. And I believe in 2010, if I have the dates correct, so even though this order came out in 2014, the gap is about half of what it might look like initially. So I think there's no doubt that would have been a lot better, but I think the question is did the agency abuse its discretion in 2014, dealing with the mess as it was presented at that time. Mr. Bellin talks about this. Is it really the agency's authority to extinguish a cause of action based on what the law was at the time? In other words, for the FCC to retroactively, in essence, rewrite the regulation when the district court, trial courts in question, could all interpret what the law was at that time and figure out for themselves whether this argument was a sufficient defense for the defendants. Right. I think the reason the answer is yes, and it's because the cause of action is predicated on a violation of the agency's rules. The agency clearly has authority to waive its own rules. So Congress set up a regime. Certainly going forward, but to retroactively rewrite the rule and give that retroactive effect and thereby extinguish a cause of action is something a step beyond. I'm not saying it's an impermissible step beyond, but it's a step beyond the usual waiver, which is just a waiver going forward. I think that's right. I think there are other actions the agency could take that would have retroactive effect. For example, if the agency were to rule today, it turns out we didn't have authority. Those causes of action would then be void. Or if it were to say, now that we've looked at it, it doesn't affect this category of facts, maybe the first selected facts or whatever category. I think the district court would respect that much along the lines of these primary jurisdictions. The regulations are what the regulations were. I just don't know that in terms of the statutory cause of action is predicated on what the regulations were. I was just making maybe a more modest point that the agency may take action today, which retroactively has effect on what the regulations were at that time. But it's certainly more, I would think that it would have a higher hurdle where it's not just, I mean, applying to pending cases typically is something that then the pending case could be taken into account of. And that's why it's not really retroactive in the kind of uprooting settled expectation sense, whereas here it really is uprooting settled expectations. And so you're saying, well, the agency has fallen all over itself to correct its error, but it seems like it's got a couple of errors here. One was the ambiguity planted in the footnote, but the other was that it's got a whole bunch of people out there trying to enforce rights that they believe they have. So it makes a different mess to say, oh, actually, never mind. I think that there's no step the agency could have taken that would not have had a downside. I agree with that. But here I think the question is what is the agency had to exercise its, you know, balancing and its discretion to decide, given these bad options, which is the best, and is it fair to impose an affirmative liability on a party as opposed to... But couldn't the courts have asked that question? In the cases. In the cases. Well, they could, Your Honor. That's right. The agency is doing whatever it can today, or the agency did whatever it can today in 2014. Suppose there had been no confusion in the 2006, 2005 era regulations and order and what have you, but the FCC now just said, you know, that was a bad order, a bad rule, bad regulation. We're waiving. We're withdrawing it and retroactively altering it. Put aside the legal niceties of this, but that's the basic story of what they're doing. Could the FCC do that and thereby extinguish the cause of action? When you say bad, you mean just a policy? Yeah. You wish we hadn't made that rule? Yeah. I don't think so. I think, well, I don't know what the procedural mechanism would be if it tried to exercise a waiver. What I'm trying to tease out is how important is the confusion to your argument. Well, there has to be a procedural mechanism for the agency to act, and here the waiver is predicated on that confusion. The good cause is predicated on the... That's right. And the agency explicitly said just a lot of liability wouldn't be enough for a good cause. And good cause is really special circumstances, but here it's the whole watermelon. Well, it's special to this regulation. That is to say it's a particular set of facts which led to this confusion, so it's not saying, for example, trying to fight out all TCPA liability. It's trying for a specific set of violations based on an order that was confusing. So it's specific to those regulations and that agency's own wrongdoing or failure. Don't you think if you were a counsel for a regulated entity, you would have said we better put the opt-out notice on everything because that's within the text of the regulation? I do, Your Honor. Again, I don't think there's a question that the correct reading of the law is that the CFR would control, and we too wish someone had sought clarification even earlier, but I think the question for this Court is did the agency abuse its discretion in 2014 in granting this waiver? Indeed, that's been the SEC's position all along. It's always been clear. Well, it's always been clear. That was your position in the AMFA order, right? That's been your position. Yeah, I think it's clear. That is to say it's a correct statement of the law that the rule controls, yes, so the agency wouldn't dispute that, but it also found basis for reasonable confusion in the order. Thank you, Your Honors. Thank you. I think we have Mr. Long. Yes, there he is. Thank you, Your Honors. May it please the Court, Robert Long representing the interveners in support of the FCC on the waiver issues. I think really Congress started this conundrum by saying that the private right of action is linked in part to violations of the FCC's regulations, and when it said that, it didn't expressly change the agency's usual authority to interpret its own regulations or, we think, to grant a waiver of its regulations for good cause. I mean, that's really the question, I think, on this part of the case. I think ultimately there's no dispute that the FCC can grant waivers to its rules. They can have retroactive effect. There's even a statement on page five of the reply brief that petitioners are challenging the FCC's ability to retroactively or prospectively waive any of its regulations on an administrative level. So I think one way to think about this is, look, okay, the FCC, setting aside for a minute the question about whether they had good cause for a waiver, but if they had good cause, they could grant a waiver that would be effective on an administrative level, and I think then the question is, what effect, if any, does that have on the private rights of action? But it's a huge, huge authority to give to the agency to have this on-off switch that applies retroactively to extinguish a private cause of action when the regulation might have said X, and the agency now wants to say, well, not X, and the party in question says, well, actually it said X, and the defendant violated the regulation as it existed at the time, and... Well, I mean, if there were a private right of action, it's an authority that I think... I agree with that. The private right of action angle is intriguing. But there is a safety valve, as Judge Randolph was raising, if it's Congress. Congress can enact retroactive legislation. It does occasionally. You know, if the agency can't be the safety valve here once Congress steps in, you know, you could imagine situations where the rule is just a mistake. It can't be done. The fax machines weren't capable of doing whatever it was the agency required. And if the view we're considering now, look, because this rule is linked to a private right of action, once the fax is sent, the agency can't do anything. Maybe it can interpret its rule. Maybe that... Presumably there would be some kind of defense in a situation like that in the court suits. And so to here, you could say, well, in the court suits, you could say that regulation, we didn't really violate it because look at the confusion that existed. And maybe that would work and maybe it wouldn't. But the idea that the FCC... I think this is the argument, and it seems different from the usual situation. I think you're acknowledging it's different. This is an unusual situation, Your Honor. It's an unusual statute, I suppose, to have it. But I will say, Your Honor, when you write... It's a provision. It is unusual. When you raise due process, I do think, you know, it's not simply that there are directly contradictory statements in the order. It's also that the notice of proposed rulemaking didn't say anything about regulating solicited faxes. When you actually look at... Well, yeah, that happens all the time. The agency goes well beyond the notice. You know, a good lawyer, and you're all good lawyers, would read the regulations and say we better not do this to your client. Let's jump in there and get some clarification. Let's file something for reconsideration. Do they really mean this? It seems like they're speaking out of both sides of their mouth. Here's the authoritative text, but, gee, you know, are we missing something? And go in... But, again, when you read the final rule, there is one sentence. One sentence. It's not even... I mean, you have to be reading each sentence very carefully. You do. It's clearly elephants and mousetraps. There's a directly contradictory footnote. And as we said, I mean, even the rule, the language that introduces that section of the rule... In addition, and the FCC has not made this argument. They have not made that argument. But if one reads the statute first, you'd never come out with the idea that a solicited fax requires a knockout notice. But, yes. The FCC has not made that argument. That's the first part of the argument, I mean, the case. So, I'm assuming that they do have this authority. What about the question of whether there's good cause here, special circumstances and a public interest? Well, I mean, our position would be that they need to show what they ordinarily would need to show to grant a waiver. That is, good cause, special circumstances, and that the public interest favors it. And there's a debate about that. We think that's an abusive discretion standard that gets applied, which maybe, again, raises your questions about this is too breathtaking an authority to give to the agency. But I think what the agency ended up saying was there was confusion or misplaced confidence that the rule didn't apply. And I would submit that even careful lawyers, when you read this, you could come away with misplaced confidence that all of this stuff is regulating unsolicited fax. I believe they even gave the waiver to entities that said, oh, we just didn't know, just the total ignorance of the standard. Not confusion, not even aware that there's an obligation, but they get the waiver also. Good cause? It's a little tough. I'm sorry, would you? Some of the entities that benefited from the waiver didn't claim confusion. They claimed they just were unaware that there was a requirement that they put an opt-out notice. Unaware. That's the argument that everybody should have to put in affidavits. And I think at that level, I mean, I'm assuming perhaps against all evidence that we've gotten over the concern about even giving the FCC this authority. But once you decide, yes, they do have this authority, I think the agency has to have quite a lot of discretion to say, look, this is confusing on its face. This is giving misplaced confidence that it only applies to unsolicited faxes on its face. We are not going to require each individual applicant to swear an affidavit. You know, they did say in the order. Now, if you just say we were ignorant of the law, we didn't read this thing at all, we didn't even try to figure out what, then you don't get a waiver. So I think that's a standard. I think it's within the FCC's discretion what evidence is needed. So I think if you get to that stage, you know, this would be within the agency's fairly broad discretion. Do you know whether in any of the pending class actions the defendants had raised the point about the footnote, the ambiguity of the order versus the regulation? I don't know the answer to that question, but I think it's certainly possible that you could get that sort of wires crossed kind of situation coming up. I mean, the permission does have to be expressed and prior. So it has to be given prior to the fax being sent. And what is your position is if we rule in favor of your argument and in favor of the FCC's with respect to the waiver, is that binding on all of the district courts where these cases are pending? My thought on that is that this court could simply say, we think that the FCC had authority to grant a waiver, and we think the waiver is valid. And you could if you want to stop there. And it would be up to the courts in the class actions to say, I mean, I think it's, at that point, it's a fairly short argument. You say, look, if there's a valid waiver, that means where the waiver applies. It was not a violation of the regulation during this time period. And that means there can't be a valid cause of action. A district judge in Connecticut could say, I don't agree. Well, I mean, I think if the district judge said that, the district judge would be wrong. And if you're prepared to go ahead. It's not going to stop the district judge in Connecticut. The point is, that could happen, right? In fact, all the district judges or trial judges could disagree with anything we say on a waiver, right? Except those in DC. I think that is the way you can resolve this case. I don't think it's necessary for you to instruct all the district courts. I don't know that we can. Well, and yes, whether you can or can't. The reason this is tricky, I think, if an agency retroactively waives a rule it was enforcing, then the due process is all on one side, arguably. But here it's retroactively altering a private right of action, so you arguably have private interests on both sides. And that's why this is a trickier circumstance. And in answer to that question, though, I mean, I do think, well, yes, the plaintiffs, or maybe more accurately the plaintiff's lawyers, have been putting resources into litigating these cases. I mean, they could read exactly the same thing. They could see, wow, there's this contradictory statement in the order. This is not very clear. It's been hotly contested all along. So, I mean, I think, yes, they've been, you know, putting resources into this, but I would say their reliance is not fully justified because there's been this sort of question. You know what? Do we have exclusive jurisdiction to review FCC regulations under this statute? I don't think so, Your Honor, but I don't know the answer to that question as I stand here. We used to. I don't know whether we still do, but exclusive jurisdiction to review licensing decisions. Much to the glee of the other circuits. Check that, and if my answer turns out to be wrong, I will submit a letter and do whatever is appropriate to get that information to the court. Okay. Thank you very much, Mr. Long. Mr. Bellin, we'll give you two minutes for rebuttal. Thank you. Just on the jurisdictional question, Your Honor, this is a Hobbs Act case, so the appeal could be from, what would happen is you have to go through the agency, and then you can go to Circuit Court of Appeal, either the D.C. Circuit, or one where I believe there's a petitioner, it's from. And I think either one. In this case, it was a raffle because it was between the 8th Circuit and here, and the D.C. Circuit, you won the privilege to have this case, Your Honor. I'm sorry to say. I want to point out something and correct Mr. Long, which I'm sure is inadvertent. There is nothing in the order that says, ignorance of the TCPA, you don't get a waiver. That's something that the Bureau seems to have created later on that's not in the record here, in fact, in one of my own cases, in one of my own cases, the advocacy mediation case, if you look at the comments, in depositions there, they said they didn't know about the TCPA, and they got a waiver anyway. So that's not what the rule is. Number two, the extent of what – I've got to tell you honestly, I didn't see that footnote, Your Honor, and I don't think anybody else did either. So to say that we were relying on something that we shouldn't have relied on, we relied on case law that says that the regulation is clear, it's got to be enforced. And even if I hadn't seen the footnote, I would have relied on the cases of this court that say, gee, footnotes inconsistent with the text of the order, you go by the order. And I would have also relied on the decisions of this court that say, if the regulation is clear, then even if the order is unclear, you go by the regulation. I mean, the notion that a lawyer who looked at this with that clear case law out there would be confused as to what's to be done is really unimaginable, Your Honor. In any event, this is a separation of power. There is no proof. The Wake Radio and Worthy Saliwa said that petitioners for waiver have a heavy burden. They haven't satisfied this here. The FCC is not allowed to assume anything. They're not allowed to assume confusion. This is not a big burden. Right and after David that says, we looked at this, we saw the regulation, we had a meeting, we said, gee, we don't know what this means, therefore, let's put it on there. Let them put that in. How hard is that to do? That's got some huge administrative burden, and that's something that the FCC could have reviewed and we could have challenged. By the way, in waiver applications, Your Honor, we have no, the persons opposing the waiver don't have an opportunity for discovery. He says, well, you know, you can just, you know, during discovery, you can find out whether they knew it or not. A lot of these cases, there hasn't been discovery, and there's no way, I think there are even some cases that seem to indicate that you can't get discovery in waiver petitions in front of the FCC. Well, a lot of it could be attorney-client privilege. I mean, who's telling you what to put on and what not to when they're reading the law? They're using that as a shield, Your Honor, in saying that we were confused. They can't have the same, they're using it as a sword. I'm saying they were confused and the case law is clear. They can't use it as a shield and say, by the way, you can't access. I mean, they can't have it both ways. So, in fact, they have to come forward with the evidence. Radio is clear on that, and so are the other cases. And we submit, Your Honor, that under these circumstances, the FCC did not have the power to do what it did, only the courts had the power, and that they haven't satisfied the standards for a waiver. Thank you, Your Honor. Thank you very much. The case is submitted.
judges: Kavanaugh, Pillard, Randolph